UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

WARREN JOYCE

**MEMORANDUM & ORDER**

1:19-cr-321 (ERK)

KORMAN, *J*.:

     Warren Joyce is a Senior Network Analyst at Mitsubishi Pharmaceuticals in Jersey City. At 6 a.m. on May 15, 2019, Joyce was sleeping with his wife beside him. His two children, aged four and twelve, slept in the next room. Then, a knock at the door: "Police!! Open the door! We have a warrant!" Just seconds later, the door to Joyce's apartment was rammed in, and a combination of twelve NYPD officers and Homeland Security agents poured through his apartment with their guns drawn. They came face to face with Joyce and his family, including his two young children, whose presence in the apartment the officers were aware of before they entered. Indeed, their tactical plan for the search listed these children as "Potential Hazards." Joyce was wearing only underwear, his wife, a nightgown. The officers "cuffed and tossed" (searched) Joyce and his wife and conducted a preliminary search of the apartment. When that search was complete, only nine minutes after they entered the apartment, the officers took Joyce into his bedroom for questioning

1

regarding his possession of computer files containing child pornography. Joyce confessed and told the officers where they could find and access the child pornography on his computer.

There is evidence to suggest that this kind of an entry—where the circumstances neither justify nor compel the use of such tactics—is not an isolated incident, either in New York City or elsewhere. Indeed, when the FBI arrested Roger Stone, a sixty-six-year-old friend and associate of the then-President of the United States, they arrived at his door while it was still dark with at least one, if not two dozen armed FBI agents. *See* Deanna Paul, *'FBI! Open the door!': The Tactics Behind the Armed Agents at Roger Stone's Home*, Washington Post (Jan. 25, 2019).[1] This for non-violent crimes relating to impeding a congressional investigation—crimes for which suspects are often allowed to self-surrender. *See id*. If it can happen to a close confidante of the President of the United States, it is not a surprise that it could happen to a family living in an apartment in Queens. The regular use of such tactics, however, does not insulate them from Fourth Amendment scrutiny.

## Background

Now-retired NYPD Detective Gergar spent over ten years working child sex crimes. Transcript of Suppression Hearing at 5-6, June 17, 2022, ECF No. 61 ("Tr.").

---

[1] *See* https://www.washingtonpost.com/nation/2019/01/25/fbi-open-door-tactics-behind-armed-agents-roger-stones-home/.

At the time relevant to this case, he was assigned to a task force operated by the Department of Homeland Security. *Id.* at 6. His investigation of Warren Joyce began like "all [his] cases." *Id.* at 9. He "went to work, [and] logged into the Child Protection System [('CPS')]". *Id*. There, he monitored IP addresses used in the New York City area that have been observed by the CPS system[2] as sharing files through the use of peer-to-peer networks. *Id.* A peer-to-peer network refers to "two or more computers that are able to connect to one another and share files with one another over the Internet." Tr. at 10. Such networks are supported by "peer-to-peer program[s]" that allow users to "search for whatever types of files [they] want to download from other people that are sharing those files[.]" *Id.* Peer-to-peer networks "are frequently used to trade digital files of child pornography." ECF No. 43-1 at 6.

Using the CPS, Detective Gergar identified an IP address in Queens, New York, that had been sharing known child pornography files. Tr. at 13. Detective Gergar subpoenaed the internet service provider associated with that IP address and learned that it was assigned to an apartment where Joyce lived with his wife and two children, one of whom was four, the other, twelve. *Id.*; ECF No. 24 at 1. Detective Gergar then performed a background check on Joyce and his wife, which revealed no criminal history for either of them except for one decades-old robbery arrest of

---

[2] A detailed description of the manner in which the CPS works may be found in *United States v. Thomas*, 788 F.3d 345, 352 n.11 (2d Cir. 2015).

3

Case 1:19-cr-00321-ERK   Document 68   Filed 10/27/22   Page 4 of 18 PageID #: 386

Joyce as a teenager. Tr. at 13-14, 22. Nor did Detective Gergar have any reason to suspect that Joyce had firearms. *Id.* at 23. Using the information collected from the CPS, Detective Gergar applied for and obtained a search warrant for Joyce's apartment. *Id.* at 14. The warrant, issued by a U.S. magistrate judge, authorized entry anytime between 6 a.m. and 10 p.m. *Id.* at 15.

On the day of the search, May 15, 2019, Detective Gergar and his team of approximately twelve officers, "a combination of NYPD detectives, sergeant lieutenant, and captain, and Homeland Security agents and their boss," assembled outside Joyce's apartment building prior to 6 a.m. *Id.* at 19-20, 43. Then, just as the clock struck 6, they executed the warrant. The officer "in the lead knocked really hard on the door saying 'police, search warrant.'" *Id.* at 20. Then, according to Detective Gergar, having waited approximately 30 seconds, without receiving a response, the officers "took down the door . . . us[ing] a [battering] ram" and charged though the doorway with their guns drawn. *Id.* at 20, 44.

When they entered, the officers "encountered Warren [Joyce] and [his wife] getting . . . out of their bedroom along with [their] two children." *Id.* at 27. The encounter then proceeded along the lines described above. At 6:10 a.m.—just ten minutes after the initial knock and break in, Detective Gergar and his partner, took Joyce to his bedroom for questioning. *Id.* at 28, 30. Joyce admitted to using peer-to-

4

peer networks to download child pornography and told the detectives that they would find it on a hard drive by a computer in the living room. *Id.* at 38.

## Discussion

Joyce moves to suppress his confession and the child pornography discovered on his hard drive. The resolution of this motion turns on whether Joyce was the victim of an unreasonable search and seizure that should result in the exclusion of the confession and the child pornography discovered on his devices.

While the officers had a warrant to search Joyce's apartment, the fact that a search occurs pursuant to a valid warrant does not immunize the manner of its execution from Fourth Amendment scrutiny. To the contrary, "[t]he general touchstone of reasonableness which governs Fourth Amendment analysis [also] governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." (emphasis in original)); *Terebesi v. Torreso*, 764 F.3d 217, 240 (2d Cir. 2014) ("[T]he Fourth Amendment protection against unreasonable uses of force extends to the manner in which a search is conducted."). Thus, "the reasonableness of government conduct in executing [even] a valid warrant[] can present Fourth Amendment issues," *United States v. Ganias*, 824 F.3d 199, 209-10 (2d Cir. 2016). In all cases, then, "the manner in which a

warrant is executed is subject to later judicial review as to its reasonableness." *Dalia v. United States*, 441 U.S. 238, 258 (1979).

Such review requires courts to "balanc[e] the extent of the intrusion against the need for it" and ultimately determine "whether the totality of the circumstances justified [the] particular sort of search or seizure." *Tennessee v. Garner*, 471 U.S. 1, 7-9 (1985). Courts have identified a number of factors relevant to this totality-of-the-circumstances inquiry. They include: the presence of any threat to the officers; whether the suspect is known to be violent or dangerous; the crime under investigation—to the extent it indicates either that the suspect poses a safety risk or that the suspect could quickly dispose of evidence; the time of day; whether the suspect posed a flight risk; whether the officers damaged property; the amount of time officers waited before committing a forcible entry; whether a tactical team was deployed; whether officers displayed, pointed, or threatened the use of firearms; the language the officers used; and the severity of any physical intrusion onto a person. *See Muehler v. Mena*, 544 U.S. 93, 99-100 (2005); *United States v. Banks*, 540 U.S. 31, 38 (2003); *Ramirez*, 523 U.S. at 71; *Graham*, 490 U.S. at 396; *Terebesi*, 764 F.3d at 231-242; *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991); *Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011); *Estate of Smith v. Marasco*, 430 F.3d 140, 148-51 (3d Cir. 2005); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190-

94 (10th Cir. 2001); *Baker v. Monroe Township*, 50 F.3d 1186, 1192-94 (3d Cir. 1995); *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992).

Under the totality of the circumstances, the execution of the search warrant here was unreasonable in at least three respects. First, the officers chose to enter into Joyce's apartment—where he lived with his wife and two children—at exactly 6:00 a.m., a time when they may have expected Joyce and his family would be sleeping—as indeed they were. They did so despite having no reason to believe that Joyce (or the evidence they sought) would be absent from the apartment if they searched at a later hour, or that Joyce would attempt to flee if they arrived when he was awake. While the warrant, issued by a U.S. magistrate judge, authorized entry between 6 a.m. and 10 p.m., as permitted by Fed. R. Crim. P. 41, the Rule does not compel the officers to execute the warrant at the earliest possible time nor does it insulate from review the officers' decision to do so in manner in which they proceeded to do.

Second, in choosing to break down the door in as little as thirty seconds after they knocked, the officers ignored guidance from a Department of Homeland Security handbook and case law providing that they "should wait a reasonable amount of time for an occupant to open the door voluntarily" before committing a forcible entry. ECF 64 at 2; *see Terebesi*, 764 F.3d at 241 ("Absent exigency, the police must give an occupant a reasonable time to reach the door[.]"). Indeed, that departmental guidance directs officers to take into account "the time of day." ECF

No. 64 at 2. Considering it was 6 a.m., the most likely explanation for Joyce's failure to instantaneously respond to the knock, even if he heard it, was that he had just been awakened, not that he was disinclined to do so if given the chance. People are likely to be less alert when they transition from sleep to wakefulness. And when the officers first entered, they encountered Joyce and his wife leaving their bedroom "along with two children," suggesting that Joyce's and his wife's first instinct was to comfort and protect their children after being awoken by a loud crash early in the morning. Tr. at 27; *see also* ECF No. 66 (the floor plan for Joyce's apartment depicts that both bedrooms in the apartment are connected by a door).

Third, the officers chose to enter with a team of approximately twelve men, with their guns drawn and displayed when they encountered Joyce and his family. All this even though the officers did not deem the warrant nor its execution to present a "high risk." Tr. at 23. Nor were they aware of any facts that would suggest they were in danger. They had no reason to suspect that anyone in the apartment had a firearm. *Id*. And they also knew that no one in the residence had a history of violence or was suspected of a violent crime. *Id*.³ Indeed, they knew before they entered that

---

³ While I may not be competent to make such a diagnosis, there is some suggestion in the literature that Joyce may have been suffering from a mental illness involving an abnormal sexual attraction to prepubescent children. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-5"), 697 (5th ed. 2013). "The extensive use of pornography depicting prepubescent children," which was found on Joyce's hard drive (ECF No.

there were two young children in the apartment, who were highly unlikely to be put at risk by their father violently responding to the police.

At the suppression hearing, Detective Gergar provided some explanations for his team's actions. On a general level, Detective Gergar said that the tactics employed that morning were consistent with "the way [he had] been doing search warrants since January 2007." Tr. at 23; *see also id.* at 16. The fact that he had been executing search warrants in this manner with regularity, however, says little about whether the officers' actions were reasonable under the circumstances of this case. More specifically, Detective Gergar testified that his team had learned that Joyce "was flying out that night from JFK Airport to the Dominican Republic." *Id.* at 17. But he could not explain why Joyce's flight at night would reasonably lead one to conclude that Joyce would depart his home in Queens shortly after 6 a.m.

Detective Gergar justified the thirty second wait time, assuming it was that long, before the forcible entry on the grounds that he has "had search warrants where people are trying to destroy evidence, putting computers in their oven while we're knocking[,]" or that suspects "can go . . . for weapons . . . [or] escape." *Id.* at 21. Detective Gergar, though, provided no explanation of why the officers would

---

43 at 3), "is a useful diagnostic indicator of pedophilic disorder." DSM-5 at 698. This was not a disorder that would suggest a danger to law enforcement officers executing a search warrant.

reasonably expect that Joyce would be doing any of these things. Joyce had no record of weapons ownership or violence. There was no indication that Joyce was escaping. Indeed, the officers knew that Joyce did not have an escape route from his apartment. And the suggestion the Joyce could have successfully destroyed evidence by throwing his hard drive into an unheated oven at 6 a.m. borders on the absurd.

Next, despite admitting that Joyce was not suspected of having a gun or of committing a violent offense, Detective Gergar defended his team's decision to enter with twelve men displaying weapons on the grounds that "there have been a lot of law enforcement officers killed in this country executing search warrants at 6:00 in the morning, including doing child sex abuse material search warrants" and that "when you take down a door, you don't know who's behind the door." *Id*. at 18. Yet neither the U.S. Attorney nor Detective Gergar provided empirical evidence for this application of these concerns to this case.[4] Indeed, the Supreme Court has held that police are excused from knocking and announcing their presence only when they "have a reasonable suspicion that knocking and announcing their presence, *under*

---

[4] Detective Gergar and the U.S. Attorney referred to a 2021 incident, which postdated this case, where an individual suspected of child pornography crimes opened fire on and killed two officers executing a search warrant at his home. *See* Tr. at 18; ECF No. 64 at 1. Neither the Detective Gergar nor the U.S. Attorney however, described the circumstances of that case and how they would compare to those present here. Indeed, the manner in which they executed the search poses a danger to law enforcement officers and occupants of the residence.

10

*the particular circumstances*, would be dangerous or futile, or that it would inhibit the effective investigation of crime[.]" *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997) (emphasis added). In this case, Joyce was not suspected of a violent crime or a crime with which weapons are commonly associated. This was not like "the execution of a warrant to search for narcotics[, which] is the kind of transaction that may give rise to sudden violence," regardless of the time of the day. *Michigan v. Summers*, 452 U.S. 692, 702 (1981).

More significantly, one of the purposes of the knock-and-announce rule, which is grounded in the Fourth Amendment, is that it "*decreases* the potential for violence, as an unannounced breaking and entering into a home could quite easily lead an individual to believe that his safety was in peril and cause him to take defensive measures." 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King, Orin S. Kerr, *Criminal Procedure* § 3.4(h) (4th ed. 2015) (internal quotation omitted) (emphasis added). This danger would seem to be equally present where law enforcement officers knock and then proceed to ram down the door within seconds as early as 6:00 in the morning. *Cf.* Kevin Sack, *Door-Busting Drug Raids Leave a Trail of Blood*, N.Y. TIMES, March 18, 2017 (available at https://nyti.ms/3fZCwM9) (noting that "at least 81 civilians and 13 law enforcement officers" died in SWAT raids involving both no-knock and knock-and-announce warrants from 2010 through 2016).

To permit a twelve-man team to pour into a home with weapons drawn based on reasoning totally untethered to a suspect and his alleged crimes would be to sanction such tactics in all circumstances. "[T]he safety of the officer[s] [] is both [a] legitimate and weighty" concern, *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977), but a general appeal to officer safety cannot eviscerate the Fourth Amendment's protection against unreasonable searches and seizures or the "respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Payton v. New York*, 445 U.S. 573, 601 (1980). Indeed, in discussing the "standards for requiring or dispensing with a knock and announcement," the Supreme Court has held that "the same criteria bear on whether the officers could legitimately enter after knocking." *United States v. Banks,* 540 U.S. 31, 35 (2003).

In the end, the explanations for the manner in which the warrant was executed in this case are unpersuasive and inadequate. Unlike other cases in which the Supreme Court has upheld the reasonableness of a search or seizure, the conduct in this case could easily "be exploited by the officer[s] . . . in order to gain more information," *i.e.*, a confession. *Summers*, 452 U.S. at 701. Indeed, "[t]he manner in which [the search] was affected gives the appearance of having been calculated to cause surprise, fright, and confusion" "in the hope that [some evidence] might turn up." *Brown v. Illinois*, 422 U.S. 590, 605 (1975). Significantly, confirming the

12

application of the foregoing observation to this case, the first thing that Detective Gergar did within nine minutes of the forced entry to execute a search warrant for Joyce's apartment was to interrogate Joyce, who proceeded to incriminate himself. Indeed, when asked if "the reason" he executes warrants "at 6:00 is because [he] could catch people probably asleep and not fully alert . . . so that [he] could question them and they might say things that they might not otherwise if [he] came" later in the day, Detective Gergar responded "I can't answer that [question]." Tr. at 17. I can. I find that the manner in which the search was executed here was solely for the purpose of increasing the chances that a shocked and disoriented Joyce would incriminate himself.

The U.S. Attorney suggests that, even so, suppression is not warranted because Joyce was provided *Miranda* warnings[5] and made his statements voluntarily. But "although a confession after proper *Miranda* warnings may be found 'voluntary' for purposes of the Fifth Amendment, this type of 'voluntariness' is merely a 'threshold requirement' for Fourth Amendment analysis." *Dunaway v. New York*, 442 U.S. 200, 217, (1979) (citation omitted) (quoting *Brown*, 422 U.S. at 604).

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the

---

[5] Joyce argues that the detectives did not provide him with *Miranda* warnings before questioning him, and that his confession should be suppressed on Fifth Amendment grounds. Because the decision to suppress the confession rests on Fourth Amendment grounds, it is unnecessary to resolve this issue.

13

> Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. . . . Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings.

*Brown*, 422 U.S. at 602 (internal citation omitted).

When law enforcement officers purposefully take unreasonable, indeed, revolting, actions of the kind taken here to instill shock and awe in a suspect to increase their chances of obtaining a confession and then obtain that confession in the immediate aftermath of those actions, the only appropriate remedy is the exclusionary rule. Moreover, not only was the execution of the search and seizure here unreasonable but, according to Detective Gergar, law enforcement officers execute these kinds of searches daily, with no regard to whether the individual circumstances justify the measures employed. Tr. at 26. They deliberately seek to break into homes in the early hours of the morning with an unnecessary show of force with the likely goal of catching a suspect off guard and eliciting a confession. This is the kind of "flagrant or deliberate violation of rights" and "systemic error" that the exclusionary rule is designed to deter. *Herring v. United States*, 555 U.S. 135, 143, 147 (2009). This is especially so because this conduct is intended to induce

a *Miranda* waiver confession that a suspect might not otherwise have made[6] and also violates the constitutional rights of the suspect's family.

Indeed, the officers subjected Joyce's wife and his twelve- and four-year-old children to the harrowing events described above, pursuant to a tactical plan of execution that reads like it was written for the execution of a search warrant at a large-scale drug operation. And as set out above, the plan actually described Joyce's children as a "Potential Hazard." *See* ECF No. 67-1. Joyce's wife was so traumatized by her experience that during the suppression hearing, she spontaneously came out of the spectators' section, to relate how "very emotional" it made her to "hear[] and . . . re-experienc[e]" the events of "that morning." Tr. at 72. Suppressing evidence in cases such as this helps ensure that law enforcement carefully consider the nature and necessity of their conduct.

*Hudson v. Michigan*, 547 U.S. 586 (2006), does not counsel against suppressing Joyce's statements. In *Hudson*, the Supreme Court held that a "violation of the 'knock-and-announce' rule" does not "require[] the suppression of all evidence found in the search." *Id.* at 588, 599. More specifically, it does not prevent "the government from seeing or taking evidence described in a warrant." *Id.* at 594.

---

[6] The U.S. Attorney contends that the officers' conduct did not play a role in causing Joyce to confess. To the extent that it makes a difference, the U.S. Attorney has failed to provide any evidence or argument to carry his "burden of showing admissibility" on that basis. *Brown*, 422 U.S. at 604.

This is so because "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Id.* at 592. As Justice Scalia wrote:

> Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression. In this case, of course, the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred *or not,* the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house.

*Id.* This case differs from *Hudson* because the application of the exclusionary rule here does not even partially stem from a violation of the "knock and announce rule" as such. Rather the role the forcible entry plays in the suppression analysis here relates to its contribution to the officer's purposeful plan to create a hellish situation that would make it more likely that Joyce would incriminate himself. Nothing comparable occurred in *Hudson*, where police merely opened an unlocked door shortly after announcing their presence. *Id.* at 588. Moreover, Justice Kennedy, who provided the fifth vote for the majority opinion, wrote separately to emphasize that the exclusionary rule has a role to play where, as here, the unconstitutional law enforcement conduct occurs pursuant to "a widespread pattern of violations." *Id.* at 604 (Kennedy J., concurring in part and concurring in judgment) (quoted with approval in *Herring*, 555 U.S. at 146-47); *see also Utah v. Strieff*, 579 U.S. 232, 242

(2016) (indicating the suppression is warranted when the evidence is obtained pursuant to "systemic or recurrent police misconduct").

A different conclusion applies to the child pornography files the officers discovered on Joyce's hard drive. Under "the inevitable discovery doctrine," the exclusionary rule does not apply to "evidence that would have been discovered even without the unconstitutional" conduct. *Strieff*, 579 U.S. at 238; *see also Nix v. Williams*, 467 U.S. 431, 443-46 (1984). One can conclude with "a high level of confidence" that the officers would have discovered the child pornography on Joyce's devices even if he had not told them where they could find it. *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006). After all, the officers had a valid warrant to search "any type of electronic device, [such as] computers, phones, thumb drives, CDs, [or other] type[s] of storage device[s]" at Joyce's residence. Tr. at 14; *see* ECF No. 43-1 at 27-30.[7] There has been no suggestion that the hard drive would have been difficult to locate if Joyce had not informed the officers of its location or that

---

[7] Joyce attacks the warrant's validity on the ground that it was issued based on illegally obtained evidence. Detective Gergar, Joyce says, acted unlawfully in using the CPS to surveil Joyce's activity on peer-to-peer networks without first obtaining a warrant. Yet the Second Circuit has held that the use of software like the CPS to gather evidence does not violate the Fourth Amendment because the CPS gives law enforcement a window into already public peer-to-peer computer activity. *See, e.g.*, *United States v. Thomas*, 788 F.3d 345, 352 n.11 (2d Cir. 2015) (providing a detailed description of how the CPS works); *see also United States v. Borowy*, 595 F.3d 1045, 1048 (9th Cir. 2010).

17

Joyce's statements enabled the investigation team to access files that they would not have been able to access otherwise.

## Conclusion

Joyce's motion to suppress is granted in part and denied in part. The U.S. Attorney may not present evidence of the statements Joyce made to the detectives during their interview of Joyce, but all evidence of child pornography recovered from Joyce's devices may be admitted.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
October 27, 2022

Edward R. Korman
United States District Judge